UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| MARILYN PHOENIX, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 3:23-cv-00001-GFVT |
| v. | ) ) | |
| MICHAEL GONTERMAN, *et al*., | ) ) | **MEMORANDUM OPINION** & |
| Defendants. | ) ) ) | **ORDER** |

*** *** *** ***

This case is the tale of a once-relaxed landlord-tenant relationship that has since devolved into hostility and mutual recrimination. The Phoenixes have brought claims against their former tenants, the Roses, and Dylan Rose's stepfather, Kentucky State Police officer Michael Gonterman, alleging a conspiracy to deprive the Phoenixes of their rights, violations of their constitutional rights under 42 U.S.C. § 1983, and various state law claims. The Defendants have now moved for summary judgment. For the reasons that follow, the Defendants' Motion for Summary Judgment **[R. 28]** is **GRANTED IN PART** as to their federal claims and the Court will decline to exercise supplemental jurisdiction over the remaining state law claims.

I

In February of 2019, Dylan and Travis Rose entered into an oral agreement to rent the downstairs apartment of a home owned by Bobbi and Marilyn Phoenix for $750 per month, utilities included. [R. 28-9 at 6; R. 28-3 at 13.] The apartment could be accessed by an exterior

door or through an interior staircase to the rest of the house.[1] [ R. 28-6; R. 28-8.] For a time, the relationship was uneventful – the Roses paid their rent, the Phoenixes were lenient if that rent was late, and the parties typically resolved any differences they had without fanfare. [R. 28- 3 at 13-15, 17.] In September 2021, the Phoenixes sought to amend the agreement, though the record is unclear as to the results of any negotiations. [R. 28-3 at 15-18; R. 28-11 at 11-13.] Viewing the facts in the light most favorable to the Phoenixes, the non-moving party, the Roses owed at least $800/month in rent starting in December 2021. The Roses made payments for November, but not for December or January. [R. 28-9 at 10; R. 28-12.]

In December 2021 the relationship further deteriorated, with the Roses accusing the Phoenixes of turning off the utilities at the property. [R. 28-10 at 23, 25; R. 28-14; R. 28-15.] On December 8, Bobbi posted a "Notice to Quit" on the door of the Roses' apartment, giving them seven days to pay late rent and fees purportedly equaling $2296.25. [R. 28-3 at 23-25.] On December 16, a locksmith arrived at the property to change the lock on a downstairs utility room, which the parties disputed access to. *Id*. at 26-27. Around the same time a contractor hired by the Roses put up a sheet of plywood to restrict the Roses' access to the utility room. *Id*.

On January 4, 2022, the events giving rise to this case occurred. Dylan and Travis Rose arrived at the property, intending to gather any remaining belongings, but discovered that the Phoenixes had changed the lock on their apartment door earlier that day. [R. 28-10 at 26; R. 28-11 at 15.] Undeterred, Travis utilized a window of the apartment to gain entry and unlock the door. [R. 28-9 at 10.] The Roses were accompanied by Michael Gonterman, Dylan's stepfather

---

[1] A door was later added at the bottom of the interior stairs between the stairs and a small foyer with two other doors, one leading to the downstairs apartment and another to the disputed utility room. [R. 28-3 at 33.] The Court notes these features not out of a passion for interior architecture, but because it is in this area that Bobbi Phoenix was allegedly pinned by the Defendants.

and a Kentucky State Police trooper. [R. 28-2 at 61-63.] Prior to arriving at the property, Gonterman had called the Sheriff, Ryan Gosser, and asked him to be present. *Id*. at 62, 64. Bobbi went out to confront Gonterman and the Roses, and asked them to leave, stating that she would be calling the police. [R. 28-3 at 31.] Per Bobbi, Gonterman then stood directly in Bobbi's face and said, "I am the police," at which point she asked to see his badge – a request he denied. *Id*. According to Bobbi, Travis grabbed Bobbi by the throat and Travis and Dylan together dragged her down the interior stairs of the home to the apartment door where they pinned her down with a piece of plywood. *Id*. Bobbi testifies that Gonterman was present for this assault and aided the Roses in pinning her down with the plywood. *Id*. at 31-33. Bobbie also testifies that Gonterman flashed his badge in her face while she was pinned. *Id*. at 35.

While the initial interaction was apparently unfilmed, Bobbi eventually began to record during the altercation at the bottom of the interior stairs. *Id*. The video depicts Bobbi demanding to be let into the downstairs apartment and being prevented from doing so by a large piece of plywood. [R. 28- 19.] Eventually, Marilyn arrives and drags Travis away from the plywood, causing it to fall on Bobbi. *Id*. Extricating herself from the situation, Bobbi turns around and retreats up the interior stairs to enter the downstairs apartment via the outside. *Id*. At this point Sheriff Gosser arrives and the video ends. *Id*. Afterwards, the parties largely stayed away from each other, with the Roses entering the upstairs portion of the property, allegedly with the permission of Sheriff Gosser, to look for some items of theirs that had gone missing. [R. 28-9 at 17-18.] While upstairs the Roses recovered a TV that had belonged to them. *Id*. Later, on January 10, 2022, the Phoenixes filed a Forcible Detainer Complaint and an Eviction Notice against the Roses. [R. 14-4; R. 28-3 at 42-43.] A Forcible Detainer Judgment was entered against the Roses on January 19, 2022, formally evicting them from the apartment. [R. 28-22.]

3

The Phoenixes have now brought several claims against the Roses and Gonterman. The Phoenixes allege that the Defendants conspired to deprive them of their constitutional rights in violation of 42 U.S.C. § 1983, that the Defendants did violate the Phoenixes constitutional rights in violation of the Constitution and § 1983, and that the Defendants committed multiple state law torts, including assault and battery, trespass, false imprisonment, and intentional infliction of emotional distress. In response the Defendants deny committing any torts, contending that they had lawful access to the apartment prior to eviction, that no assault ever occurred, and that Bobbi was at all times unrestrained and free to leave. The Defendants also contend that § 1983 is inapplicable because at no point did Gonterman act "under color of state law."

## II

Under Rule 56, summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). A fact's materiality is determined by the substantive law, and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). "[T]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). "Instead, 'the non-moving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.'" *J.B-K.-1 v. Sec'y of Ky. Cabinet for Health & Fam. Servs.*, 462 F. Supp. 3d 724, 731 (E.D. Ky. 2020), *aff'd sub nom. J. B-K. by E.B. v. Sec'y of Ky. Cabinet for Health & Fam. Servs.*, 48 F.4th 721 (6th Cir. 2022) (quoting *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)).

Summary judgment is inappropriate where there is a genuine conflict "in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 535 (6th Cir. 1995) (quoting *Liberty Lobby*, 477 U.S. at 255).

In this case, video evidence is also present and depicts a significant portion of the disputed events. While the Court must draw all inferences in favor of the non-moving party, "to the extent this version of events is 'blatantly contradicted' by videotape evidence, we must 'view[ ] the facts in the light depicted by the videotape.'" *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 493 (6th Cir. 2012) (quoting *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)); *see also Bruck v. Petry*, 2022 WL 2109187 at *4 (E.D. Ky. June 10, 2022) (viewing facts in light depicted by video); *Byrd v. Bryant*, 490 F. Supp. 3d 1202 (E.D. Ky. 2020) (viewing facts in light depicted by audio file). In short, for that portion of events depicted in Bobbi's video, the video will control.

### A

Examining the Phoenixes' claims under 42 U.S.C. § 1983, it is well established that, in order for § 1983 to be applicable, the defendant – or at least one of the defendants given the Phoenixes conspiracy claim – must be acting under the color of state law. *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). Courts must consider the totality of the circumstance in determining whether an officer was acting under color of law at the time of the alleged constitutional violation. *Morris v. City of*

5

*Detroit, Michigan*, 789 F. App'x 516 (6th Cir. 2019) (citing *Neuens v. City of Columbus*, 303 F.3d 667, 671 (6th Cir. 2002)). "Acts of police officers in the ambit of their personal, private pursuits" are not covered by § 1983. *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975). Here the relevant defendant is Gonterman.

The Defendants contend that Gonterman, a Kentucky State Police trooper, was not acting under color of law during the incident on January 4, 2022. In support of that contention, they rely on several undisputed facts: Gonterman was in plainclothes and driving his personal car, [R. 28-3 at 30-31; R. 28-18], Gonterman was unarmed, [R. 28-4 at 95], the Phoenixes initial impression of Gonterman was merely that "he was somebody's dad or stepdad helping them move," [R. 28-3 at 31; R. 28-11 at 81], Gonterman called the sheriff to the property rather than handling things himself, [R. 28-4 at 21, 64], and Gonterman was on injured leave from KSP at the time. [R. 28-4 at 66.] In Bobbi's version of events, Gonterman took three actions that support a finding of state action: he approached her and stated "I am the police" when Bobbi stated she would be calling the police, assaulted her with the plywood board so Travis could pin her to the wall, and later briefly flashed her his badge while she was pinned. Bobbi acknowledges that at one point she did ask to see Gonterman's badge. [R. 28-3 at 31-35.]

There are two problems for the plaintiffs in this case. First, Bobbi's description of events does not align with the video footage she herself took. Second, even if all her allegations were true, that still does not establish Gonterman acted under color of state law. In her deposition, Bobbi states that she was pinned under the plywood when Gonterman flashed his badge and said, "Can you see it now?" *Id*. She also states that this occurred during the time in which she was recording the altercation. *Id*. at 36-37, 49. Having viewed the video itself, the Court is unconvinced by Bobbi's subjective version of events. In the video Bobbi does not appear to be

6

pinned in any way – instead the plywood is merely being used to block her entry into the downstairs apartment via the internal stairs. [28-19.] In a profanity laden tirade, Bobbi repeatedly demands that she be let into the downstairs apartment, all while pushing and kicking the board. *Id*. Later in the video, Bobbi even turns and walks up the staircase that was behind her the entire time. *Id*. The only time when Bobbi appears to be potentially pinned is when Marilyn grabs Travis and forcibly prevents him from holding the board in place, causing it to fall against Bobbi in the corner. *Id*. Notably, Gonterman does not intervene to prevent Marilyn from grabbing Travis in what sounds to be an angry attack, nor does he show Marilyn his badge. *Id*. At no point in the video does Gonterman appear to flash his badge, however the Phoenixes have provided a picture where Gonterman does appear to be showing his badge, which he carries in his wallet. [R. 34-2.] That picture does not depict Bobbi being pinned in any way.

Having reviewed the footage, the facts, as depicted by the record and viewed in the light most favorable to the Phoenixes, demonstrate two acts undertaken by Gonterman that would support finding he acted under color of state law: stating that he was the police and showing Bobbi his badge after she had asked to see it. Certainly "whether the officer flashed a badge" or "identified himself as a police officer" are relevant factors courts consider in determining whether the officer acted under color of state law. *Memphis, Tennessee Area Loc., Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 903 (6th Cir. 2004). However, as noted above, the Court must consider the "totality of the circumstances" to determine if an officer was acting under color of state law, making the endeavor an inherently fact-bound inquiry. *Morris*, 789 Fed. App'x at 518.

In considering the totality of the circumstances here, it is clear that Gonterman was not acting in his capacity as a police officer on January 4, 2022. While not determinative,

7

Gonterman was categorically off-duty at the time due to a prior injury and was told that during his injured leave he was not to be "actively investigating or involving [himself] in law enforcement duties" unless it is a "life-or-death situation." [R. 28-4 at 77.] This is further supported by the fact that Gonterman did not intervene in any way when Marilyn rushed onto the scene and grabbed Travis while he was holding the plywood board. [R. 28-19.] Indeed, anticipating that law enforcement may be necessary, Gonterman called the sheriff en route to the apartment and asked him to be there – suggesting Gonterman was not himself intending to be the law enforcement on scene. [R. 28-4 at 21, 64.] When he arrived, both Bobbi and Marilyn merely believed he was there as someone's father or stepfather, due to his lack of a uniform or police car. [R. 28-3 at 31; R. 28-11 at 81.] Nor was this a situation where Gonterman "intervened in a dispute between third parties pursuant to a duty imposed by police-department regulations." *Morris*, 789 Fed. App'x at 518. He was there with his stepson and son-in-law as a parent, not a police officer.

    While Gonterman did "flash his badge" while on the scene, this is ultimately not enough on the facts of this case to transform his alleged conspiracy with the Roses and ensuing assault into actions take under color of state law. Courts have routinely found officers to be acting in their personal capacity in situations where there were far more indicia of state action than are present here. In *Morris*, the officer in question went to the plaintiffs' home while on duty, albeit not in uniform, seeking repayment of a personal debt. *Morris*, 789 Fed. App'x at 518-19. She had her badge, handcuffs, and service revolver with her, the last of which she discharged during her visit to the plaintiffs' home. *Id*. This was insufficient to establish that the officer was "acting under color of law." *Id*. In *Mendez v. County of Los Angeles*, the Ninth Circuit found that an officer could be acting as a private citizen during a shooting even when he showed his badge and

8

gun prior to that shooting. *Mendez v. Cnty. of Los Angeles*, 167 F. App'x 590, 592 (9th Cir. 2006). In *Parilla-Burgos v. Hernandez-Rivera*, the First Circuit concluded that the officer in question did not act under color of law when the officer intervened in a bar fight, identified himself as a police officer, and ultimately shot and killed someone with his service revolver. *Parrilla-Burgos v. Hernandez-Rivera*, 108 F.3d 445, 449-451 (1st Cir. 1997). In *Blair v. Harris*, the court found that the officer in question was not acting under color of state law when he shot a suspect he saw attempting to steal his personal vehicle, even though the officer yelled "Halt. Stop. Police." *Blair v. Harris*, 2010 WL 3805588 (E.D. Mich. Sept. 23, 2010). Here Gonterman briefly identified himself as an officer and showed his badge when asked.

The Phoenixes suggest that KSP policy reinforces their assertion that Gonterman showing his badge is the equivalent of his acting in an official capacity. That policy, in relevant part, states

> 14. Identification: Officers shall carry their badges and identification cards on their persons at all times, except when impractical or dangerous to their safety or an investigation. Officers shall furnish their name and badge number to a person requesting such while they are on duty or while holding themselves out as having an official capacity, except when the withholding of such information is necessary for the performance of police duties or is authorized by their commanding officer. Failure to carry proper identification is a Class C violation.

[R. 34-3.] But this policy does not stand for the proposition the Phoenixes assert. Certainly an officer *must* show their badge while on duty, but it says nothing about whether officers may or may not do so when off duty in their personal capacity. Indeed, the fact that Gonterman initially refused to show his badge, and only did so later after repeated requests from Bobbi, suggests he was not acting in an official capacity as identified by the above regulation.

The Defendants present two final pieces of evidence which they suggest cut against finding Gonterman acted under color of state law. First, they have produced an expert report

9

from David Jude, a former police officer with over two decades of law enforcement experience, including training and supervising other officers. [R. 28-23.] Having reviewed the facts of the case, Jude concluded that Gonterman was not acting in an official capacity as a law enforcement officer, noting Gonterman took no action to separate the parties during a volatile situation and called the local Sheriff rather than his own agency to the scene. *Id*. at 11-12. Second, the Defendants present an affidavit from KSP's General Counsel, Shawna Kincer, stating that Gonterman was not acting as KSP trooper during the events due to his injury leave and that KSP would not be providing legal counsel or indemnification for this action. [R. 28-24; R. 28-25.]

Assessing the totality of the circumstances, the Court concludes that Gonterman was not acting under color of state law during the events at issue in this case. He arrived at the Phoenixes in his capacity as a father and that is how he stayed throughout. While Gonterman flashed his badge at one point during the events, and allegedly permitted the Roses to assault Bobbi, he did so at her request and not to imbue his actions with the imprimatur of state authority. The Defendants are therefore entitled to summary judgment on the Phoenixes' claims under 42 U.S.C. § 1983.

**B**

Both parties have a multitude of state law claims remaining, but with the federal claims in this case being dismissed the Court must assess whether it should continue to exercise supplemental jurisdiction. Under 28 U.S.C. § 1367, a district court "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." If all federal claims are dismissed prior to trial, "the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244,

1254–55 (6th Cir. 1996). "[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006); *see also* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Packard v. Farmers Ins. Co. of Columbus Inc.*, 423 F. App'x 580, 584 (6th Cir. 2011) (noting the Sixth Circuit applies "a strong presumption against the exercise of supplemental jurisdiction once federal claims have been dismissed.") "Residual jurisdiction should be exercised only in cases where the 'interests of judicial economy and the avoidance of multiplicity of litigation' outweigh our concern over "needlessly deciding state law issues." *Moon*, 465 F.3d at 728.

The Court sees nothing, on this record, to overcome the general presumption in favor of dismissal. Judicial economy and convenience do not counsel in favor of exercising supplemental jurisdiction. The parties have devoted little time to their state law claims, with their summary judgment briefing almost entirely focused on the federal law claims, and there has been little development of the Defendants' counterclaims. [R. 28-1 at 20-22; R. 34 at 13-19.] The Court's energy has largely been spent dealing with only two state law counterclaims, one of which was dismissed, and this motion for summary judgment. [R. 25; R. 28.] The depth of evidence in this case is also not immense, with much of the action depicted in Bobbi's video, suggesting little risk of duplicative efforts on the part of a state court.

Furthermore, the state law claims that remain are not cut-and-dry, counseling in favor of comity and deference to state courts. For example, the Phoenixes' state law trespass claim is bound up in a series of shifting, amorphous, oral agreements for a month-to-month tenancy. [R. 28-3 at 13-18, 41-42; R. 28-10 at 15-16, 19, 22, 33, 35.] The validity of those agreements under state law is unclear and may ultimately determine the trespass issue. Meanwhile, the Defendants

11

contend they had lawful access until formal eviction proceedings were complete. [R. 28-1 at 20.] Alternatively, based on a theory advanced by the Phoenixes, the trespass issue may rely on state law determinations of what constitutes abandonment and the extent of a tenant's property rights when apparent abandonment clashes with an intended eviction. [R. 34 at 13-17.] Rather than wade into murky waters, the Court concludes the state law claims in this case are better handled by a Kentucky state court.[2]

### III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendants' Motion for Summary Judgment **[R. 28]** is **GRANTED** as to the Plaintiffs' federal law claims under 42 U.S.C. § 1983;

2. The Plaintiffs' federal law claims are **DISMISSED WITH PREJUDICE**;

3. The Court declines to exercise supplemental jurisdiction over the Parties' state law claims and those claims are **DISMISSED WITHOUT PREJUDICE**;

4. This action is **DISMISSED** and **STRICKEN** from the Court's active docket;

5. Any pending motions are **DENIED AS MOOT**; and

6. A Judgment will be entered contemporaneously herewith.

---

[2] The Court also notes that there appears to be no prejudice to the parties if they are forced to refile in state court. Indeed 28 U.S.C. § 1367(d) "supplies a tolling rule" for statutes of limitations that state courts "must" apply. *Artis v. D.C.*, 583 U.S. 71, 76 (2018) (citing *Jinks v. Richland Cnty., S.C.*, 538 U.S. 456, 459 (2003)).

This the 17th day of December, 2024.

Gregory F. Van Tatenhove
United States District Judge